**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

WILLIAM LOEHR,

          Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

          Defendant.

No. C05-3025-MWB

**REPORT AND RECOMMENDATION**

---

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

    *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*    *Introductory facts and Loehr's hearing testimony* . . . . . . . . . **3**
        *2.*    *Joan Portz's testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*    *Loehr's medical history* . . . . . . . . . . . . . . . . . . . . . . **10**
        *4.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . **20**
        *5.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

III.   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND*
       *THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . **23**

    *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **23**
    *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **26**

IV.   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

V.    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

## I. INTRODUCTION

The plaintiff William Loehr ("Loehr") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits.  Loehr claims the ALJ erred in failing to evaluate his subjective complaints fairly, and in failing to make a comprehensive, individualized assessment of his residual functional capacity.  (*See* Doc. Nos. 16 & 23)

## II. PROCEDURAL AND FACTUAL BACKGROUND
### A. Procedural Background

On September 25, 2002, Loehr protectively filed an application for SSI benefits.  (R. 385-89)  On October 25, 2002, he filed an application for DI benefits.  (R. 54-56)  Although Loehr initially alleged a disability onset date of April 1, 2001 (*see id.*; R. 15), at the ALJ hearing, he amended his alleged disability onset date to September 24, 2002.  (R. 406)  Loehr claims he is disabled for the following reasons: "Burned esophagus and throat, has a PEG (feeding tube), severe depression, plerisy [sic], mild dislectsive [sic].  Also has Hepititas [sic], right hand-previous injury to self."  (R. 69)  Loehr claims these conditions limit his ability to work because he "[h]as to have continuas [sic] feeding, continuas [sic] siting [sic] upward or bending over causes severe pain and nausea, does not comunacate [sic] or function well in public without anxiety or anger overwhelming to the point of negative actions, has a tendency to due [sic] things backward in spite of instruction."  (*Id.*)  On his Disability Report submitted with his application, Loehr stated he quit working for the following reasons: "From Jan. 1986 or sooner to Jan. 2002 was never able to hold a real steady job due to depression, but in Jan. 2002 stopped working all together [sic] due to becoiming [sic] overwhelmed with depression.  Started self mutalation [sic] and other destructive behaviors going back and forth from violent tendencies to severe depression.  On Sept. 24, 2002, snapped and attempted suicide by

2

drinking at least 12 oz. of muratic [sic] acid." (*Id.*) Loehr's applications were denied initially and on reconsideration. (R. 36-42, 45-48, 390-400)

Loehr requested a hearing (R. 49), and a hearing was held before ALJ George Gaffaney on September 28, 2004. (R. 402-53) Loehr was represented at the hearing by attorney Jean Mauss. Witnesses at the hearing included Loehr; Joan Portz, Director of Community Support Services for Northwest Living in Fort Dodge, Iowa; and Vocational Expert ("VE") Roger Marquardt.

On November 23, 2004, the ALJ ruled Loehr was not entitled to benefits. (R. 13-23) Loehr appealed the ALJ's ruling, and on March 11, 2005, the Appeals Council denied Loehr's request for review (R. 8-11), making the ALJ's decision the final decision of the Commissioner.

Loehr filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Loehr's claim. Loehr filed a brief supporting his claim on December 1, 2005. (Doc. No. 16) The Commissioner filed a responsive brief on January 23, 2006. (Doc. No. 22) Loehr filed a reply brief on February 2, 2006. (Doc. No. 23) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Loehr's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Loehr's hearing testimony

At the time of the hearing, Loehr was thirty-one years old. He is 5'10" tall and weighs about 150 pounds. Prior to his 2002 suicide attempt, he weighed about 185

pounds. According to Loehr, he has tried to regain the weight but has been unable to do so. (R. 406-07)

Loehr completed the eighth grade in school. He was placed in a state group home "[f]or insubordination." (R. 407-08) He later received a G.E.D. He is able to read and write, although he sometimes needs assistance understanding things he reads, such as Social Security notices. (R. 408)

Loehr lives alone in an apartment. He smokes cigarettes, and has some history of abusing alcohol and other drugs. He drinks a beer about once a week, and he sniffs inhalants on occasion, including a couple of months prior to the hearing. (R. 409) He last used cocaine in 2002, the night before he attempted suicide. He admitted he had used marijuana sometime early in 2004. (R. 410-11)

Loehr stated he is prevented from working due to the following impairments:

> I get nauseous very easy from leaning forward or bending forward. I choke and aspirate very easy. The valve from where my trachea used to be [allows] my saliva or anything else [to] easily go[] into my lungs. And then I've got extreme varicose veins in both of my legs that are very painful to stand on for very long at a time.

(R. 411) He can eat solid foods "for a little bit," but his diet mostly consists of "soups and liquids like Slim Fast and ice cream." (R. 411-12) It takes him thirty to forty-five minutes to eat a meal. (R. 412) He suffers from constant fatigue. He is nauseous almost daily, and he vomits two or three times a week, sometimes due to food intake, but other times related to "acid reflux overdrive" or stress." (R. 412-13)

Loehr stated he has had a surgical procedure to widen his esophagus about once a month for the last two years. The procedure is done on an outpatient basis. He stated doctors "scrape" his esophagus, "widen it, [and] do a biopsy." (R. 412)

At the hearing, Loehr's attorney noted Loehr was leaning back in his chair "at about 20 or 25 degrees back from vertical." Loehr stated this was "[t]o keep the stress off [his]

4

stomach because [his] stomach backs up through [his] throat real easy when [he] lean[s] forward too fast or for very long a period of time." (R. 413) Loehr stated he aspirates "quite often through the night, almost nightly," and it also happens periodically during the day. (R. 414) When this happens, he has to "sit there and cough it out." (*Id.*) He avoids leaning forward or crouching, and he does very little bending or stooping to avoid the reflux and aspiration. He stated stomach acid goes up into his nose, sinuses, and eyes, and causes his eyes to burn. (*Id.*) Loehr stated he has a raw pain in his throat when at rest, and when he eats, he has a choking, piercing pain as he swallows. (R. 415) He also has diarrhea almost daily, but he does not know if the diarrhea is from one of his medications or from the after-effects of his suicide attempt. (R. 423) He stated that when it is nearing time for him to have another surgery on his esophagus, he will have difficulty swallowing his medications and he has to crunch them up to take them. (R. 430)

In addition to his esophageal problems, Loehr has problems with his right hand, which he injured when he was younger. He is unable to make a fist or to pull his index finger down to the palm of his hand, but he can pick up larger objects. He stated when he uses his hand too much, his knuckles "literally lock up." (R. 415) The problem is mostly with his index and middle fingers, but it also affects his pinkie finger to a lesser degree. (*Id.*) His index and middle fingers do not bend but "lock up . . . under extreme us[e] or different temperature changes." (R. 416) He is able to write for only a short time before his hand cramps up and his fingers "just lock into a weird position." (*Id.*)

Loehr has been diagnosed with Hepatitis C, but as of the time of the hearing, he had not yet begun Interferon treatment. He indicated he was awaiting approval for Title XIX benefits to begin the treatment. He stated the Hepatitis causes his kneecaps, shoulders, elbows, and the back of his neck to pop, crack, and snap. (R. 416-17)

Loehr stated he has pain throughout his entire legs due to varicose veins, worse on the left than the right. When he stands, he feels pressure, "like the vein wants to burst out of the skin." (R. 417)

Loehr began seeing a psychiatrist after he was released from ICU following his suicide attempt in 2002. He stated he has tried a lot of different medications, but he still experiences depression and gets angry easily. Loehr stated when he gets angry, he becomes verbally abusive to people around him. According to Loehr, he receives "a tranquilizer" shot of Risperdal every two weeks that is supposed to help him control his anger. (R. 418-19) Loehr stated he still feels suicidal periodically, but he tries to "sleep it away." (R. 420) He stated a "good day" is when he does not "cuss nobody out" and perhaps visits with friends during the day. On a bad day, he may "get vulgar or sometimes . . . even cry." (R. 420) Every ten days or so, he will have a day when he just stays in bed all day. (R. 421)

Loehr stated he has had memory problems since his suicide attempt. He has difficulty focusing and has problems reading, watching TV, and paying attention to things. He usually cannot get through a half-hour television program. He sometimes feels anxious, panicky, or paranoid. (R. 422-23)

At the time of the hearing, Loehr stated he was taking Lexapro (an anti-psychotic), Wellbutrin (an anti-depressant), Prevacid (an antacid), Tramadol (a pain medication), and Risperdal (a tranquilizer). (R. 423)

Loehr estimated he could lift up to fifty pounds, but he would be reluctant to do so for fear of tearing open the "extra hole in [his] stomach." (R. 424) He is able to vacuum his floor but he does not pick up the vacuum cleaner, and he takes breaks between rooms. Overexertion sometimes makes him wheeze. He stated he can be motivated to do a job but not be able to do it physically. (R. 424-25) When he cooks something, he frequently takes breaks to sit down. He sits on a stool to wash his dishes because of leg pain from his

varicose veins. He estimated he could stand for no more than ten to fifteen minutes at a time. (R. 425-26, 428) Although Loehr had not yet had surgery on his varicose veins, he had begun talking with his surgeon about it, and he planned to have the veins treated in the future. (R. 426-27) He stated he cannot sit for more than few minutes before he has to change position or move his legs. (R. 428-29) He has difficulty climbing stairs because he becomes short of breath easily. (R. 429)

Loehr described his average day as follows. He awakens frequently during the night due to aspiration. He gets up about 8:30 a.m., brushes his teeth, gets cleaned up, and dresses. He noted he performs these activities at a much slower pace than he used to because he finds it more comfortable and less stressful to take his time. He often has lunch at the Salvation Army, which is a few blocks from his home. He may visit with friends who live in the neighborhood. (R. 429-30) Loehr does his own grocery shopping, but usually has a friend accompany him to help him. He has no hobbies. He periodically visits the Disability Alliance, which is a type of support center for disabled persons. (R. 430-31)

Loehr indicated he was suspended from going to the Disability Alliance office at one point due to some type of disturbance. He completed some type of mental health treatment in May or June 2004, and he also underwent an evaluation for drug and alcohol dependency. (R. 431-32) He stated he had used alcohol excessively on at least one occasion, and he had used inhalants at least once. (R. 432-34) However, according to Loehr, the evaluation showed he did not have a problem with chemical dependency, and the evaluator recommended he not go through treatment but just continue with his mental health care. (R. 433-34) Loehr stated he last used methamphetamine a year-and-a-half or two years prior to the hearing. He admitted he still consumes a "few beers." (R. 434-35)

Loehr stated he gets assistance with his rent through HUD. He obtains medication samples from his doctor and "Webster County Relief" helps pay for his other medications. (R. 435) He picks up pop cans off the street to return them for the refund. (R. 436)

## 2.    *Joan Portz's testimony*

Joan Portz is Director of Community Support Services for Northwoods Living in Fort Dodge, Iowa. She has an Associate's Degree in Social Work, and a Bachelor's Degree in Education. At the time of the hearing, she had been a licensed Social Worker for about ten years. (R. 437-38)

Portz described the work of Northwoods as providing "services to people with disabilities so that they can learn the skills and have the support that they need to live in the community." (R. 438) She noted the agency primarily works with people who have mental illnesses. (*Id.*)

Loehr first came into contact with Northwoods in 2003, through their homeless intervention services. They helped Loehr sign up for HUD assistance and find a place to live. Then in June 2004, Loehr was referred to Northwoods for additional services, and Portz stated the agency has had almost daily contact with Loehr since that time. She described the services they provide to Loehr as follows:

> We assist him with his medication. We set it up for him for a week at a time and then he is given one day's supply of medication each day. We also assist him with getting to and from his mental health appointments. Help him to communicate with his psychiatrist more effectively. We have been assisting him with the paperwork in the organizational types of things to do like food stamps and keep[ing] up with his housing, assistance applications, and with the Social Security appeals process.

(*Id.*)

Portz stated Northwoods does not assist persons whose primary diagnosis is substance abuse. In her opinion, Loehr does have some substance abuse problems, but she views them as co-existing with his mental health problems. She stated she has noticed that Loehr "can go for quite a while without using any substances and using his prescribed prescriptions," but if he begins to get more and more depressed, he starts using drugs again. (R. 439) Portz stated she can tell when Loehr is becoming more depressed because he will become more introverted, unresponsive to staff who visit him at his apartment, and neglectful of his housework and his personal appearance. She indicated once these symptoms begin to appear, his condition declines rapidly. (R. 438-41) Portz believes she can tell when Loehr has been abusing inhalants or alcohol because he will have dilated pupils and slurred speech, make "off the wall comments," and walk with something "like a drunken swagger." (R. 440)

According to Portz, Loehr's mental problems cause him to have difficulty maintaining concentration and organized thinking. She stated his substance abuse evaluation had to be split into two sessions because Loehr had difficulty staying focused. She also observed that when Loehr does phone interviews with Northwoods workers and others, "after a period of time he just [has] to stop because he says he gets overwhelmed and it's getting mixed up in his head." (R. 442)

Portz stated Loehr has mentioned he hears "the voice of God," stating this began after his father died when he was a child. (R. 443) She also indicated she has seen Loehr have angry outbursts when he yells obscenities. She stated he sometimes makes a hand gesture that is "kind of like a hail [sic] Hitler salute," and he yells out something, which Loehr has told her is how he controls his anger. (R. 444)

In Portz's opinion, Loehr has difficulties even when he is not abusing substances. She stated, "He has trouble with organizing things like with keeping appointments or knowing what day it is even sometimes  He has trouble with having a lack of motivation

to carry out the tasks of daily living.  He has some physical issues too but I would say that mostly his mental issues are the greatest barrier for him in functioning." (*Id.*)

### 3.    *Loehr's medical history*

Loehr was admitted to the hospital on September 24, 2002, after attempting suicide by drinking about half a cup of hydrochloric acid. (*See* R. 157-90)  Upon admission, he reported that he had consumed about twelve beers that evening, and his toxicology screen was "positive for cocaine and benzo's." (R. 159)  The acid caused oral lesions on the roof of Loehr's mouth, tongue, and nasal and oropharynx; significant injury to his upper esophageal sphincter, duodenum, and stomach; and relatively mild injury to his esophagus. He underwent a tracheostomy and a PEG (feeding tube) was inserted.  He was discharged on October 5, 2002, with instructions to take nothing by mouth.  His discharge diagnoses were acid ingestion, diffuse superficial esophagitis, linear long ulcerations within the body of the stomach, ulcerations about the cricopharyngeus, acute ventilatory and respiratory failure, alcohol abuse; and major depressive disorder, single episode, severe. (R. 157) His discharge medications were Reglan liquid (used to treat esophageal ulcers and erosions), Prevacid (used to treat gastric ulcers and gastroesophageal reflux disease or GERD), Carafate liquid (used to treat duodenal ulcers), and Remeron (used to treat major depressive disorder). (R. 158) (*See* www.rxlist.com for drug descriptions.)

Loehr developed an infection around the PEG site, and on October 9, 2002, doctors prescribed antibiotics to treat the infection. (R. 203)  The next day, he reported the redness was no better or worse, but the pain and itching were not quite as bad as the previous day.  By October 11, 2002, the redness and pus around the area were improving. (R. 204)  Loehr's tracheostomy was removed on October 14, 2002.  The next day, Loehr went to the emergency room complaining of vomiting, and right-sided chest pain with radiation into his right shoulder. (R. 191, 200)  He was treated with Toradol and

Solumedrol, and was discharged with a diagnosis of pleurisy. (R. 191) The record indicates that by late November 2002, Loehr's tracheostomy had closed and he was able to vocalize again. (R. 219)

At a follow-up exam on October 30, 2002, Loehr complained of bad heartburn, a sort throat, swelling in his throat, seepage around the PEG tube, white milky tears, and foamy spit. (R. 201) He was scheduled for an esophagogastroduodenoscopy ("EGD") to dilate his esophagus. Loehr apparently had undergone a prior EGD since his discharge from the hospital. (*See* R. 208) The current procedure was performed on November 5, 2002, with a note that the procedure would be repeated in two weeks. (*Id.*) Loehr underwent EGD procedures to dilate his esophagus on November 19, 2002 (R. 210); December 2, 2002 (R. 211); and December 26, 2002 (R. 215). He apparently would do well for a couple of weeks after each dilation, but then his strictures would recur. Loehr was able to eat food by mouth for a couple of weeks following a dilation, but then he would begin having pain with swallowing solids. He continued to use his PEG tube for feeding as needed, and by February 2002, he was maintaining his weight.

Loehr continued to have regular EGD procedures to dilate his esophagus. He underwent procedures on March 27, 2003 (R. 315); May 1, 2003 (R. 313-14); June 2, 2003 (R. 312); July 7, 2003 (R. 310); August 19, 2003 (R. 309); October 6, 2003 (R. 307); October 20, 2003 (R. 305); December 2, 2003 (R. 300); January 29, 2004 (R. 344, 376); March 2, 2004 (R. 343, 375); April 8, 2004 (R. 339, 373); April 29, 2004 (R. 337, 368); June 21, 2004 (R. 336); and August 2, 2004 (R. 334). On each occasion, strictures were visualized and dilated.

With regard to his mental health, Loehr continued to exhibit depressed mood by the end of December 2002. He also complained of auditory hallucinations. However, the record indicates he was not always compliant with his medication regimen. (R. 218) His mood was better and he exhibited fair insight and judgment when he was taking his

medications as directed. (*See* R. 219)  By January 8, 2003, he was back on his medications, and he reported he was no longer depressed and was doing better overall. (R. 226)  He continued to report doing well on February 3, 2003, and his psychiatrist, Dr. Uzoma Okoli, assessed Loehr's depression as being in remission. (R. 225)

On February 12, 2003, Lon Olsen, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form and a Psychiatric Review Technique form concerning Loehr. (R. 246-64)  Dr. Olsen noted that as long as Loehr was complaint with his medications, he showed improvement in his condition and Dr. Okoli had assessed Loehr's depression as being in remission.  Dr. Olsen further noted Loehr performed his own self-care; he engaged in a number of daily activities, including washing the car, raking leaves, doing laundry, mowing the lawn, and the like; and Loehr had reported having adequate relationships with his coworkers and employers.  He observed that Loehr "is quite forgetful and easily distracted," "has trouble finishing the tasks he starts," and is sometimes "confused by directions." (R. 250)  Dr. Olsen opined that with continued treatment, by September 24, 2003, Loehr should improve to the point that he would be only moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriate with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and travel in unfamiliar places or use public transportation. (*Id.*; *see* R. 246-47)  On April 7, 2003, John C. Garfield, Ph.D. reviewed the record and concurred in Dr. Olsen's assessment. (R. 251)

On February 12, 2003, Rene M. Staudacher, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment concerning Loehr. (R. 265-74)  She found Loehr has a medically-determinable impairment of esophageal strictures secondary to acid ingestion.  However, she found Loehr was maintaining his

weight and had "sufficient nutritional intake to sustain 6 hours walking/standing/or sitting." (R. 273)  The doctor limited Loehr's lifting to fifty pounds occasionally to avoid stressors on his PEG tube, but noted this limitation might be lifted if the PEG tube were removed in the future.  (R. 273-74)

Loehr returned to see Dr. Okoli for follow-up on March 3, 2003.  The doctor increased Loehr's Remeron dosage after Loehr reported being agitated and angry at family members.  (R. 224)  At a follow-up visit a week later, Loehr was feeling better.  The doctor referred Loehr to a partial hospitalization program for additional treatment.  (R. 223)

On March 19, 2003, Loehr went to the emergency room complaining of burns and abrasions on his lower extremities.  He stated he had started a fire to burn some trash and he somehow became burned and possibly fell, causing the abrasions.[1]  The wounds were debrided and dressed, and doctors prescribed Keflex.  (R. 232-36)  He returned for follow-up on March 21, 2003, and reported his pain had improved.  The wounds were cleaned, debrided, and re-dressed, and he was given a prescription for Silvadene cream and Darvocet.  He was told to change his dressing regularly and follow up as needed with his family doctor.  (R. 237-41)  When Loehr saw Dr. Okoli again on March 24, 2003, his sister accompanied him to the session.  She told the doctor she did not believe Loehr's burn injury was accidental, although Loehr maintained he had not attempted suicide.  Loehr stated he was still hearing voices periodically.  The doctor prescribed Risperdal at bedtime to control the hallucinations.  (R. 222)

On April 10, 2003, Janet C. Hunter, D.O. reviewed the record for reconsideration of Loehr's disability claim.  She noted that although Loehr continued to report increased difficulty with swallowing about two weeks after each esophageal dilation, his weight

---

[1] The emergency room records are somewhat illegible.  They appear to indicate the fire "blew him back," but this is not entirely clear.  (*See* R. 232)

remained steady. She further noted the record contained no evidence that Loehr had experienced any complications or infection from his leg burns. Dr. Hunter affirmed Dr. Staudacher's findings. (R. 275)

Loehr continued to see Dr. Okoli regularly for mental health treatment. On April 1, 2003, he reported that he had been doing well and he was taking his medications as prescribed. (R. 296) On April 15, 2003, he reported continuing to hear voices occasionally, and stated the voices sometimes told him to harm himself. His Risperdal was increased. (R. 295) Notes indicate Dr. Okoli referred Loehr to the partial hospitalization program, but when the program staff contacted Loehr, he refused to participate. His prognosis was listed as "guarded presently." (R. 294)

Loehr continued to report feeling depressed on April 29, 2003. His Remeron dosage was increased. (R. 293) At his next follow-up visit on May 13, 2003, Loehr stated he had been "on a natural high" and he felt happy. Dr. Okoli observed Loehr could be exhibiting signs of mania and he planned to evaluate Loehr more frequently. (R. 292) Loehr had no new complaints on June 3, 2003. Dr. Okoli noted Loehr was "no longer engaging in dangerous behaviors such as fire starting." (R. 291) The doctor planned to refer Loehr again to the partial hospitalization program. (*Id.*)

At his next visit on June 18, 2003, Loehr stated he had argued with his sister and had been forced to move out of her home, where he had been living since his suicide attempt. He was not hearing voices and was not particularly depressed. Notes indicate Loehr was drinking "about two glasses of wine every day and [he did] not want to stop drinking." (R. 290) Loehr cancelled his appointment on July 8, 2003. (R. 289) At his next follow-up on July 21, 2003, he stated he had no new complaints other than excessive sedation from his medications. Dr. Okoli reduced the Remeron dosage and started Loehr on Lexapro. (R. 288)

The next progress note, dated September 9. 2003, indicates Loehr had not been keeping his appointments with Dr. Okoli. Loehr had lost some weight. He complained that his pain medications had been withdrawn, and he admitted he was drinking alcohol. He expressed fear that he might get esophageal cancer and might need surgery. He denied having any significant financial difficulties but admitted he had not been eating adequately. Loehr agreed to restart Remeron and Risperdal, and Dr. Okoli warned him about the need to take his medications as prescribed. (R. 287)

Loehr cancelled his appointment on September 12, 2003. (R. 284) The record indicates that on that date, Loehr went to the emergency room where he was admitted after he reported overdosing on drugs. He stated he had taken an unknown amount of medications, and he had been drinking beer. The next day, he denied overdosing on drugs, and stated he had just taken two Prevacid pills. He apparently had had an encounter with police for playing his stereo too loud, and he was arrested for public intoxication and jailed briefly. Loehr complained of hearing voices and he admitted to drinking alcohol in binges. He stated he usually drank about two beers per week, but he had consumed eight beers the previous day. He stated he had smoked marijuana, used cocaine, and used methamphetamine in the past. Because of Loehr's previous serious suicide attempt, he was kept for further evaluation. Dr. Okoli saw Loehr while he was in the hospital. He started Loehr back on Remeron and Risperdal. Loehr was discharged on September 15, 2003, with a diagnosis of psychotic disorder not otherwise specified, and major depressive disorder recurrent severe with possible psychosis. His GAF on admission was assessed at 30, and on discharge at 45. (R. 352-60)

Loehr next saw Dr. Okoli on September 26, 2003. He stated he had not been doing well. His energy level was down, and he continued to have conflicts with his sister. He had been taking his Risperdal at bedtime. Dr. Okoli noted Loehr "denies using illicit drugs, but he 'borrowed' some Ritalin from a friend off the street. The Ritalin helped his

attentiveness and he would like to get some of the Ritalin prescribed for him." (R. 285) Dr. Okoli prescribed Strattera (used to treat ADHD in children and adults), and directed Loehr to continue taking Risperdal and Remeron. (*Id.*) Loehr was not compliant with the Strattera, stating he did not like the taste and "he would prefer to go on Ritalin for his inattentiveness and excessive daytime somnolence." (R. 284) He was still drinking alcohol, and he smelled of alcohol at the appointment, although the doctor noted Loehr "was rational and was not rambling or disorganized." (*Id.*) Dr. Okoli warned Loehr of the risks of mixing alcohol with his medications, and emphasized the need for medication compliance. He discontinued the Strattera and started Loehr on Provigil.[2] (*Id.*) Loehr had no new complaints on October 15, 2003, and he was directed to continue on his current medications. (R. 283)

On October 22, 2003, Loehr went to the emergency room after reportedly falling from his bicycle. He complained of pain to his right eye and facial area and the entire right side of his hip. He had lacerations around his eye and an abrasion to his right lateral lower side. Loehr admitted to drinking six to eight beers. X-rays of his cervical spine were negative. A facial X-ray showed a deviated nasal septum to the right and changes consistent with chronic rhinitis, but his orbits were normal and there were no apparent abnormalities. His wounds were cleaned, and he received sutures to his laceration. Doctors prescribed Darvocet. (R. 348-50)

On November 12, 2003, Dr. Okoli saw Loehr for follow-up. He noted Loehr was "not compliant with his medications." (R. 282) Loehr denied feeling depressed, but still complained of "some degree of inattention." (*Id.*) He was directed to continue on Remeron, Risperdal, and Provigil. (*Id.*)

---

[2]Provigil is "indicated to improve wakefulness in patients with excessive sleepiness associated with narcolepsy, obstructive sleep apnea/hypopnea syndrome, and shift work sleep disorder." www.rxlist.com, "Provigil" (Apr. 19, 2006).

Loehr saw Dr. Okoli on January 5, 2004, and reported he still had problems with inattentiveness but he was not feeling depressed or suicidal. He admitted noncompliance with his medications. (R. 333) On January 13, 2004, a representative of Webster County Disabilities Alliance called Dr. Okoli and stated Loehr had run out of Provigil. Loehr apparently had been taking three tablets instead of one-and-one-half tablets, and he appeared extremely drowsy. Dr. Okoli directed Loehr to stop taking Provigil and be seen in his office as soon as possible. (R. 332) Loehr saw Dr. Okoli on January 30, 2004, and stated he accidentally had flushed his pills down the toilet. He was not feeling suicidal and had no new complaints, but the doctor noted he was disheveled. (R. 331)

Loehr cancelled his appointment on March 1, 2004, because he did not have transportation. (R. 330) He saw Dr. Okoli the next day and stated he had been disorganized and had been using marijuana regularly. He denied feeling depressed. His sister accompanied him to the session, and Dr. Okoli encouraged her to accompany Loehr to further sessions. He emphasized that Loehr's ultimate prognosis depended on his ability to abstain from illicit drugs and comply with his treatment. (R. 329)

Loehr next saw Dr. Okoli on March 24, 2004. He stated he was "still wanting to have his rent reimbursed on the grounds that he was not able to work." (R. 328) He stated he had used marijuana recently, but claimed he had not been drinking or using other illicit drugs. He stated he was taking his medications as directed. Dr. Okoli again emphasized the need for Loehr to abstain from using illicit drugs. He continued Loehr on Remeron, Risperdal, and Provigil. (*Id.*)

Loehr saw Dr. Okoli on April 14, 2004, and stated the "pain clinic" had told him to contact the doctor for a prescription of Adderal, an amphetamine used to treat narcolepsy and ADHD. (*See* www.rxlist.com, "Adderal," Apr. 19, 2006) Loehr complained that Provigil was not helping him at all and he still was experiencing daytime somnolence. Dr. Okoli advised against any stimulant medications due to a possible

worsening of Loehr's psychosis. He opined Loehr's psychosis could be related to his use of illicit substances. He directed Loehr to continue taking Remeron and Risperdal, but discontinued the Provigil based on Loehr's statement that it was not helping him. (R. 327)

On April 28, 2004, Loehr went to the emergency room complaining that a park bench had fallen onto his left foot, crushing it. X-rays of his foot were normal. (R. 338, 370)

Loehr returned to see Dr. Okoli on May 13, 2004. He stated he had been psychotic and had not been doing well at all. He had rambling speech and was disheveled. He was not compliant with his medications. Loehr admitted to using marijuana, but denied using other illicit drugs, although the doctor suspected Loehr had been using methamphetamine. Dr. Okoli recommended "case management services as well as supervision of [Loehr's] medications by CSP." (R. 326) He prescribed Risperdal tablets and injections. (*Id.*)

When Loehr next saw Dr. Okoli on May 18, 2004, he was extremely disorganized and smelled strongly of "some unspecified substance." His speech was rambling and he was disheveled. He refused inpatient admission. Dr. Okoli noted Loehr had a pattern of poor medication compliance and he continued to use illicit substances. He warned Loehr that he would not progress in psychiatric treatment as long as he continued using illicit drugs. Dr. Okoli noted, "Will continue to treat [Loehr] for now but will strongly consider discharging him from this clinic if he continues not to follow treatment recommendations." (R. 325)

On June 7, 2004, Loehr was involuntarily committed to the hospital after he admitted using methamphetamines, and county medical staff became concerned about him. Notes indicate Loehr's condition had continued to deteriorate and he periodically had slurred speech, jittery movements, and disorganized actions. Dr. Okoli met with Loehr's family and emphasized that if Loehr continued using illicit drugs, he likely would remain psychotic and could pose a danger to himself. After a hearing, Loehr was court-ordered

to follow up with mental health treatment and with outpatient substance abuse treatment. Loehr was discharged on June 9, 2004, on Risperdal and Abilify. His prognosis was noted to be guarded. (R. 378-82)

Loehr saw Dr. Okoli for follow-up on June 15, 2004. He had been doing better since his release from the hospital, and he admitted that he had been huffing inhalants prior to his admission. He was established in getting his medications on a daily basis from Northwoods Living. Dr. Okoli noted Loehr was disheveled, but he was coherent, oriented, and exhibited no evidence of delusional thinking. Loehr was continued on his current medications. (R. 323)

Loehr saw Dr. Okoli on July 8, 2004, accompanied by staff from Northwoods Living. Loehr complained of feeling depressed and anxious, and of having nightmares. He was complaint with his medications and denied using illicit drugs, drinking alcohol, or huffing inhalants. Loehr was poorly groomed, inattentive, and somewhat disorganized. He was continued on Risperdal injections, and Lorazepam and Lexapro were added. Loehr requested a change in psychiatrists "just for a change." Dr. Okoli gave him the names of other psychiatrists in the area, and advised Loehr that a change in doctors would require a court order. (R. 321)

Loehr returned to see Dr. Okoli on August 3, 2004, accompanied by a staff member from Northwoods Living. He was compliant with his medications, and he denied using illicit drugs or huffing inhalants. He reported being "somewhat unhappy," but he was not suicidal. He was better groomed and exhibited fair insight and judgment. He was continued on Risperdal injections, and his Lexapro dosage was increased. (R. 320)

Loehr saw Dr. Okoli again on August 31, 2004. He had been feeling more depressed and stated he had started huffing inhalants again. He had thought of suicide periodically. The doctor noted Loehr "was somewhat bizarre," but was articulate. The

doctor added Wellbutrin to Loehr's medications and again advised him against using illicit substances. He recommended Loehr be hospitalized if he had suicidal thoughts. (R. 319)

Loehr saw Dr. Okoli on September 8, 2004, with no new complaints. He was taking his medications as prescribed and stated he had not been depressed. He was feeling better since starting the Wellbutrin. Dr. Okoli noted Loehr smelled faintly of an inhalant. He increased Loehr's Wellbutrin dosage and continued his other medications without change. (R. 318)

### 4.    *Vocational expert's testimony*

The ALJ asked VE Roger Marquardt to consider "an individual now age 31, age 27 at the alleged onset date with . . . 8th grade being the highest grade completed and with a GED and with a past relevant work as set forth in [the past relevant work summary, *see* R. 150]." (R. 446) The ALJ further postulated that the individual would be able to lift twenty-five pounds frequently and fifty pounds occasionally; stand and sit for six hours at a time; perform gross manipulation frequently with the right hand only; and have only occasional interaction with the public. (*Id.*)

The VE indicated "the machinist operator II, as noted in the past relevant work summary, as well as the automobile detailer would fall within those guidelines. The construction worker, as [Loehr] performed the work, would also be appropriate." (*Id.*)

The ALJ next asked the VE to consider an individual with the same lifting and sitting requirements, but who could only stand for fifteen minutes at a time, climb only occasionally, "do only simple routine repetitive or constant tasks," make no independent decisions, not have to meet a specified production rate or pace within a time frame, have only occasional interaction with coworkers and no interaction with the public, and have no changes in the work setting. (R. 446-47) The VE stated this hypothetical individual would not be able to return to any of Loehr's past work, and would have no skills that could be

utilized in other jobs. (R. 447) However, the VE stated the hypothetical individual would be able to perform unskilled work. He gave examples of an escort vehicle driver, which is a sedentary job; a coin machine operator, which is light work; and a basic machine tender, which also is light work. (R. 448)

The ALJ then asked the VE to consider an individual with the same limitations as stated in the second hypothetical, but who also would have to miss three or more days of work per month. The VE stated this individual would not be able to perform any jobs in the national economy. (*Id.*)

Loehr's attorney asked the VE to consider a hypothetical individual who could lift fifty pounds occasionally and twenty-five pounds frequently; sit, stand, or walk for six hours in an eight-hour day; rarely bend or stoop; use only his right hand for frequent gross manipulation; and have a moderate limitation in his ability to understand, carry out, and remember detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 448-49) The VE stated this hypothetical individual could not return to any of Loehr's past work, and he would not have transferable skills to other work. However, the VE still opined the individual could perform the jobs of coin machine collector or escort vehicle driver. (R. 450)

The VE indicated that if the individual could bend over or stoop for no more then 10% of the workday, he could not perform competitive employment of any kind. The VE noted, "[E]ven in sedentary work there's bending that's involved." (R. 451) Similarly, even if the individual could bend over, but he had to take twenty- to thirty-minute breaks four to six times weekly due to aspiration problems, he would be precluded from all competitive employment. (*Id.*)

## 5. *The ALJ's decision*

The ALJ found Loehr has not engaged in substantial gainful activity sine his amended alleged disability onset date of September 24, 2002. (R. 16) He found Loehr has severe impairments consisting of "depression, esophageal stricture, and varicose veins," but he concluded Loehr's impairments, either singly or in combination, do not reach the listing level of severity. (R. 16-17) He specifically found Loehr's mental impairment does not meet Listing 12.04. He found Loehr's mental impairment results in "moderate restriction of his activities of daily living; moderate difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence or pace," with no episodes of decompensation. (R. 17) The ALJ concurred in the state agency consultant's assessment that although Loehr's depressive disorder was severe at the time of his suicide attempt, it "would not be severe for a period of 12 consecutive months beginning with September 24, 2002." (*Id.*)

In considering Loehr's residual functional capacity, the ALJ made the determination that Loehr's "past history of alcohol and drug abuse are not contributing factors material to the determination of disability." (R. 18) He noted Loehr has been able to work for many years at above the substantial gainful activity level with no significant problems despite his substance abuse. (*Id.*)

The ALJ found Loehr's testimony concerning his impairments was not fully credible. He noted that although Loehr complained of problems with varicose veins, "the record does not contain evidence of diagnosis or treatment for this condition."[3] (R. 20) The ALJ noted Loehr can prepare simple meals, attend his medical appointments, watch television, and socialize occasionally with relatives as desired. (*Id.*) He further noted Loehr frequently was noted to be noncompliant with his medications and other treatment

---

[3]The court finds it curious that if the ALJ found no evidence whatsoever to substantiate Loehr's claim that he is impaired due to varicose veins, the ALJ nevertheless found varicose veins to be a severe impairment. (*See* R. 17)

recommendations, and the record evidenced no work restrictions imposed upon Loehr by his treating physicians. (R. 20-21)

The ALJ determined Loehr retains the residual functional capacity to lift fifty pounds occasionally and twenty-five pounds frequently; stand and sit for up to six hours in an eight-hour work day; frequently handle with his right hand; and interact with the public occasionally. (R. 21) Based on this RFC and the VE's testimony, the ALJ concluded Loehr is able to return to his past relevant work as a construction worker, machine operator, and automobile dealer. (*Id.*) He therefore found Loehr is not disabled, and denied his claims for benefits. (R. 22-23)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598,

600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.

20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant

numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search

the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Loehr asserts the ALJ erred in two respects. First, he argues the ALJ failed to evaluate his claim that he is unable to sit or bend in accordance with the *Polaski* standard and social Security Ruling 96-7p. Second, Loehr argues the ALJ failed to make a comprehensive, individualized assessment of his residual functional capacity. He notes the only medical opinion of record concerning his mental RFC is from a state agency consultant. He argues the ALJ erred in failing to evaluate Joan Portz's testimony properly, to consider the treatment notes from Dr. Okoli, and to evaluate his mental RFC properly.

The Commissioner disagrees on both counts. She argues the ALJ evaluated Loehr's credibility properly, citing similar factors to those cited by the ALJ in his opinion. (*See* Doc. No. 22, pp. 17-22) Tcourt agrees with Loehr that neither the ALJ nor the Commissioner satisfactorily addressed Loehr's claim that he is unable to sit or bend without experiencing reflux, aspiration, or other symptoms. As Loehr succinctly states in his brief, although these specific allegations are not set forth in the medical evidence, his treatment records support his claim that he experiences problematic symptoms that would interfere with his ability to work when he sits upright or bends forward. The VE testified that if Loehr could only bend forward for ten percent of the workday, he would be unable to perform competitive employment, because even sedentary work requires some bending. The undersigned finds further consideration is warranted of this particular aspect of Loehr's claim.

On the second issue, the Commissioner argues Loehr "failed to meet his burden of proof that his residual functional capacity preclude[s] him from all work available in the national economy." (Doc. No. 22, p. 22) On this point, the undersigned wholly disagrees. The records of Loehr's mental health treatment demonstrate ongoing depression, exacerbated by substance abuse issues and noncompliance with medications and other treatment recommendations. It is not at all clear from the record, however, that

29

these instances of noncompliance demonstrate a willful, controllable refusal to follow medical advice. Indeed, once Loehr was placed on a schedule where he had to obtain his medications daily from a health care provider, his compliance with treatment became regular and consistent and his symptoms were under better control. This at least suggests that Loehr's mental illness itself was the underlying cause for his noncompliance and his continued tendency to turn to illicit substances for relief.

However, the court does need to make any express finding regarding the cause of Loehr's periodic noncompliance with his treatment regimen. The case should be remanded in any event to obtain an opinion from Dr. Okoli regarding how Loehr's mental illness would affect his ability to work. The undersigned is concerned that the *only* medical opinion of record is from a state agency consultant who never examined Loehr, but only examined the treatment records. The state agency consultant's opinion, rendered in February 2003, offers an opinion that Loehr should be sufficiently recovered from a mental health standpoint to sustain gainful employment by September 2003; in other words, the consultant opined Loehr's mental disability would not last for more than twelve consecutive months. However, the evidence of record demonstrates Loehr continued to experience largely the same symptoms by September 2003 that he experienced immediately following his suicide attempt. He was hospitalized in September 2003, after lying about taking a drug overdose. His GAF on admission was 30, indicating behavior that "is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (*e.g.,* sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32 (4th ed. 1994). Upon discharge two days later, his GAF was assessed at 45, indicating serious symptoms or serious impairment with social

and occupational functioning. *Id.* These assessments of Loehr's Global Assessment of Functioning were made by Dr. Okoli, his regular treating psychiatrist.

During the next year prior to the ALJ hearing, Loehr continued to see Dr. Okoli regularly. He was committed involuntarily in June 2004, after he admitted to using methamphetamines and his mental health had deteriorated substantially. He continued to evidence use of inhalants through August 2004, and Dr. Okoli continued to assess Loehr's prognosis as guarded.

The record evidence does not paint a picture of a mentally healthy individual capable of sustaining gainful employment. The undersigned suggests an accurate determination of Loehr's mental residual functional capacity cannot be made without obtaining an opinion from Dr. Okoli regarding the extent to which Loehr's substance abuse is a factor in his ongoing depression, and the extent to which Loehr's depression, regardless of its cause, would affect his ability to function in the workplace.

For these reasons, the undersigned finds the record does not contain substantial evidence to support the ALJ's determination that Loehr is not disabled. An ALJ has a duty to develop the record fully. "That duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Although the Commissioner argues none of Loehr's treating physicians placed work limitations on him, the ALJ never *asked* Loehr's treating physicians whether the symptoms Loehr experiences when he sits upright or bends over would limit his ability to work. Similarly, the ALJ never asked Dr. Okoli for an opinion regarding how Loehr's mental impairment would affect his ability to work. The lack of notations in the treatment notes regarding work restrictions cannot constitute substantial evidence in the record to support a finding that Loehr is not disabled. *See id.*

The undersigned recommends this matter be remanded for further development of the record with regard to Loehr's claim that he is unable to sit upright or bend without suffering significant, disabling symptoms, and with regard to Loehr's mental residual functional capacity.

## V. CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed above.

**IT IS SO ORDERED.**

**DATED** this 20th day of April, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).